JEREMIAH T. BOYLE, Respondent, v. CHARLES CHAMBERS AND WIFE, Appellants.

*Wife's Estate in Lands.*—The husband cannot, in this State, by his deed, alien the estate of his wife in lands without her consent.

*Evidence—Ancient Deeds.*—Boyle v. Meegan, 19 How. 149, and Reaume v. Chambers, 22 Mo. 36, 53, cited and affirmed. Where the deed of a married woman was not executed in conformity with the law in force at the date of its execution so as to convey her estate, it will not become effective as an ancient deed from lapse of time.

*Paraphernalia.*—The husband could not, by the Spanish law, alienate the wife's paraphernalia property without her consent.

*Appeal from St. Louis Land Court.*

The facts of the case appear from the opinion of the court. The title and deeds upon which the question presented arose, will be found set forth at length in the case of Reaume v. Chambers, 22 Mo. 36.

*R. M. Field,* for appellants.

I. The deed of 1818 being more than thirty years old, and having been produced from the proper custody, was admissible in evidence without further proof. This rule of evidence is nowise affected by the circumstance that some of the parties labored under the disabilities of coverture. The rule is founded on the necessity suggested by the antiquity of the deed. (1 Gibb. Ev. 103; 2 Phil. Ev. 475; 1 Green. Ev. 570, 521.)

II. The execution of the deed from Mrs. Mallette is proved by her own testimony, as appears from the deposition.

III. By the Spanish law, the right was vested in the husband, upon his marriage, to convey the paraphernal property of the wife with her consent. This right was not taken away by the introduction of the common law. (1 Dom. Civ. Law, § 884; 4 Partida, Tit. 11, L. 17; Schmidt, Span. Law, 81; Escriche, Dict. *voc. Bienes parafernales;* Lindell v. McNair, 4 Mo. 380; Moreau v. Detchmendy, 18 Mo. 522; Moss v. Allen, 27 Mo. 354.)

IV. By the rules of the common law, the deed of the hus-

Boyle v. Chambers.

band is effectual to convey the fee in the land of the wife, sub-
ject to be avoided only by the wife or her heirs; and in the
present case no such avoidance is shown.

It is purposed to discuss some principles of the common
law, applicable to the proposition contained in this refused
instruction.

"If the jury find that the deed of Antoine Mallette to P.
Chouteau was the deed of Antoine, and was made and deliv-
ered by him after intermarriage with Angelique Moreau, then
said deed operated to pass to Chouteau the wife's interest in
the land therein described, subject to be avoided by the wife;
but that the deed of the sheriff is not sufficient to avoid the
estate so passed to Chouteau."

In the case of Norcum v. Sheahan, 21 Mo. 25, the ques-
tion was, whether the deed of the husband could, during the
continuance of the coverture of the wife, be avoided by anoth-
er deed of the husband and wife. It is held that it could be
so avoided. But it is the unanimous opinion of the court
that the deed of the husband, alone, had passed the wife's es-
tate.

It will be observed that although in that case the wife had,
in fact, joined in the deed, yet, on account of her non-age, her
execution was a nullity; and that the argument and opinion
are based upon the proposition of the deed being the sole deed
of the husband. By that deed, says Judge Scott, (p. 29,) the
estate of the wife "did pass—it conveyed a defeasible estate
in fee; and had it never been defeated, their vendee's title
would have remained valid."

The case at bar essentially differs from Norcum v. Sheahan
in the material fact that Angelique Mallette has never exer-
cised her privilege of avoiding the deed of her husband. The
plaintiff, unlike Norcum, does not claim by a subsequent con-
veyance from the wife. On the contrary, he claims in spite
of her. He claims to have her estate by a transfer *in invitum*.
This radical distinction in the facts of the two cases should
be observed whenever the ruling in Norcum v. Sheahan be
applied to the case at bar.

Although the well-established principles of the common law, upon which depends the proposition presented by the instruction, have been recognized by this court in several cases, yet they are of such unfrequent application in practice that the recollection of the court will be asked to some elementary learning. Nor can such reference be useless in any case, as, according to Mr. Preston, in no science, so much as in that of the law, is a recurrence to first principles so necessary for the formation of correct conclusions.

*a.* What estate has a husband in the lands of his wife ?

It is commonly said that he has a life estate. This description of his interest is not confined to the unlearned. It is frequently used by lawyers of the present day, and has crept upon the bench. In Norcum v. Sheahan, the late judge of the Common Pleas instructed the jury that by marriage the husband became tenant for life, with remainder in fee in the wife, of the lands of the wife,—thus depriving the wife, by the fact of marriage, of all estate of present enjoyment in her own land, and ignoring the familiar law that a remainder can only be created by deed, and never by act of law.

This court reversed the Common Pleas, and decided (p. 28) that the husband, by the marriage, became " seized of a freehold estate in his wife's land," by which is to be understood a freehold of inheritance, or in fee. When we examine the language of accurate law writers, from Littleton to Kent, we find this description of the estate : " Husband and wife are seized in fee, in right of the wife." If other terms are used to express the quantity or quality of this estate, they are synonymous : for instance, " Husband and wife are seized jointly in fee for and during the coverture."

The relation of husband is created by the fact of marriage. If the wife die, living the husband, his estate in her lands is at an end. A husband, therefore, as such, has no estate for his life in the lands of the wife. If issue be born of the marriage, his estate does not determine by her death ; but the common law does not recognize him as tenant for life. It constructed a paraphrase to describe his interest, and to this

day we have the ancient estate of tenancy by the curtesy of the laws of England. Herein we see the care which the sages of the law had, to prevent those erroneous conclusions which ever flow from the use of inaccurate terms. All the concomitants of an estate, independent of the heir, are visible, and he is said by the ancient law writers to hold of the lord paramount. So, in our system, a similar principle obtains. Our statute of descents excepts the widow's dower; the course of descents is designated subject thereto; no exception is made of the husband's curtesy, yet curtesy survives the statute.

"By the intermarriage," says Roper, (Roper on H. & W., p. 3,) "the husband acquires a freehold interest during the joint lives of himself and wife, in all such freehold property of inheritance as she was seized of at that time, or may become so, during the coverture."

"If," says Coke, (Co. Litt. 67 a,) "the husband hath issue by the wife, then he is entitled to an estate for term of his own life, in his own right; and yet he is seized in fee, in right of the wife, so as he is not bare tenant for life."

In Polyblank v. Hawkins, (Doug. 314, 1 Saunders, 253 n,) the husband had declared that he was seized in his demesne as of freehold in right of his wife. The court, upon demurrer, held that he should have declared that "he and his wife were seized in their demesne as of fee in right of the wife." The same is stated in 1 Bacon's Abr. 695; and such will be found the view entertained of the husband's estate in all well-considered modern cases.

The merging of the wife in the husband is complete. If an estate in fee be given to a man and his wife, they are neither properly joint tenants nor tenants in common; for husband and wife being considered as one person in law, they cannot take the estate by moities, but both are seized of the entirety, *per tout, et non pour mie :* the consequence of which is, that neither the husband nor the wife can dispose of any part without the assent of the other, but the whole must remain to the survivor. And if a grant is made of a joint estate to

husband and wife and a third person, the husband and wife shall have one moiety and the third person the other moiety, in the same manner as if it had been granted to two persons. So, if the grant is to husband and wife and two others, the husband and wife take one-third in joint tenancy, (2 Black. Com. 282).

That an estate may be defeated, or is to determine upon some future event, does not seem to vary its quantity during its continuance. "He (says Coke, Co. Litt. 18 *a*) that hath a fee simple, conditional or qualified, hath as ample and great an estate as he that hath a fee simple absolute; so that the diversity appeareth between the quantity and quality of the estate."

*b*. What is the effect, on the estate of the wife, of the alienation, by the husband, of her lands?

It seems that, at the earliest known period of the common law, the estate of the wife could not be, in any manner, aliened so as to bar herself or heirs. This was a consequence of the legal extinction, by marriage, of the woman. She was deemed incapable of performing any act to affect her rights; and her joining in a feoffment with her husband, was, as to her, a nullity. But the necessities of men have, in all ages, broken down all restrictions on the free alienation of lands, and so in this case, the rule of common law was overcome by a fiction. When it was desired to transfer her lands, the bargainee brought a suit, setting up a fictitious title thereto. The wife appeared in court, and being privily examined by the judges, and acknowledging that she had no defence to make to the suit, and no defence being made by the husband, judgment was rendered for the claimant. This proceeding became the common mode of assurance, and being recognized as such, a tax, or fine, per acre, for every alienation was levied for the king's use. Such is, in brief, "a fine."

But, although it was by the tedious and costly method of a fine that husband and wife could alien the lands of the wife so as effectually to bar her and her heirs, yet the common law (says Roper on H. & W., p. 55) imparted to "the husband

as a necessary incident to the seisin he acquired of the wife's freehold estate by marriage, a power by alienation, of converting her interest in it to a mere right; for the property of the wife during the coverture being vested in her and her husband *indivisibly*, he acquired the right of possession, which, being conveyed away by him, the wife was not allowed, from the unity of their estate and interest before described, to consider the act of her husband a disseisin of herself which might be defeated by mere entry, but she was permitted to contest the right only."

The husband, says Kent, (2 Com. 133,) " cannot alien or encumber the lands of the wife, if it be a freehold estate, so as to prevent her or her heirs, after his death, from enjoying it, discharged from his debts and engagements. But, from the authorities when closely examined, it seems that the husband has the power to transfer the whole estate of his wife, and the estate will be in the alienee of the husband, subject to the right of entry of the wife or her heirs."

In the recent American case of Lewis v. Cook, 13 Iredell, 195, the facts were similar to those of the case at bar. A deed purporting to convey the wife's land was a nullity as to the wife; and a similar ruling had been made at the trial, upon the theory that the deed of the husband had passed an estate only for his life. The reporter's note of the case is in these words:

" When one takes a conveyance in fee, with covenant of warranty, from a husband and wife, and the title of the wife does not pass in consequence of the want of her privy acknowledgment, yet the bargainee takes an estate in fee, as to all the world, except the wife and those claiming under her, not barred by the statute of limitations."

The decision of the court is substantially in this language:

" It is not true that the vendee of the husband had an estate for the life of the husband; he was seized in fee. The terms of the limitation was to him, his heirs and assigns; and notwithstanding the fact that it had an infirmity, and might be put an end to by reason of a defect in the title, still it was

a fee simple. It was good until the death of the husband, and then it was only wrongful as to the wife or her heirs. Suppose the vendee had died seized, could there be a question that his wife was entitled to dower? His estate, like that of the vendee, would be good against every one, except the wife or her heirs."

In Norcum v. Sheahan, this court said, (21 Mo. p. 29): " The deed of Vasquez and wife, (null as to the wife,) conveyed a defeasible estate in fee, and had it never been defeated, their vendee's title would have remained valid."

The control of the husband over the lands of the wife also appears in another direction. Thus, if a married woman levy a fine as a femme sole, it will be binding on her and her heirs if the husband in his life-time does not avoid it; but he can at any time defeat the fine of his wife. (1 Roper, H. & W., p. 141; Comyn's Dig., title, Fine.)

The position that a bargain and sale did not operate on the estate of the wife, although stated by Judge Scott, in Norcum v. Sheahan, is immediately dissipated by his own decision. " At common law, any alienation by husband seized in right of his wife was a discontinuance to his wife and her heirs." 3 Thom. Coke, p. (113,) * top p. 91. Whenever conveyances, operating under the statute of uses, which are commonly said to be innocent conveyances, have a warranty annexed, then such conveyances are as potent to effect a discontinuance as a feoffment, and these other alienations which are commonly said to be wrongful. Note A, to 3 Thomas' Coke, p. (92). *

c. In what manner can the defeasible estate of the husband's alienee be avoided?

At the common law, when the husband had aliened the wife's land, and died, the wife could neither enter upon the

---

* The statute of Henry, usually called the statute "against discontinuances," does not alter the effect of the husband's alienation. It only remedies the wrong by enabling the wife to avoid it, in a simple and summary manner. But, notwithstanding the statute, the estate is in the alienee of the husband till the avoidance. See, upon this point, 1 Preston on Abstracts of Title, 335, where a compendium of the law respecting the alienations by husbands will be found. See, also, 1 Bac. Abr. 724.

land, or maintain an ejectment for its possession; but in order to avoid the alienation of her husband, she had to bring her writ of right to revest her estate. The statute of Henry obviated the necessity for such action upon the right, and enabled her to avoid the alienation of her husband by either an actual entry or a writ of entry.

" She was," says Kent, (2 Com. 133,) " driven at common law to her writ of right, as her only remedy; but Lord Coke says he found that in the times of Bracton and Fleta the writ of entry *cui in vita* was given to the wife, upon the alienation of her husband, and this was her only remedy in the age of Littleton. That writ became obsolete after the remedial statute of 32 Henry VIII., c. 28, which reserved to the wife her right of entry, notwithstanding her husband's alienation."

Also, let us observe, that neither by any common law mode of conveyance, nor by any conveyances operating under the statute of uses, was any alienation permitted of lands in the adverse possession of another.

Our statute, therefore, which obviates the necessity for entry in order to convey lands of which the possession has been lost to the owner, and gives to all conveyances the like effect, as if the party making such conveyances was in the actual possession thereof, would seem to enable Mrs. Mallette to avoid the alienation of her husband by a simple act of conveyance. This is conceded. But it is denied that, until she has done some act effectual to avoid the estate of her husband's alienee—either by the common law, the statute of Henry, or by our statute—that she has any estate or interest in the land, vendible by execution.

" When a man may enter or claim, the law will not adjudge him in possession till entry or claim." (1 Coke, R. 94, Shelly's case; Co. Litt. 218 *a*; 2 Coke, R. 536.)

" For till entry it doth not appear; having power at his election to void or continue the estate, which he will do." (Note 3 to Co. Litt. 218 *a*; Litt. § 351.)

Instances are frequent in the law, in which estates depend

upon the exercise of the will of a woman discovert of baron. If a husband makes an exchange of the lands of his wife for other lands, this exchange, after his death, can be avoided by the wife, but until she avoids the exchange she has no estate in her original parcel. (Co. Litt. 51 *a*.) So, when the husband aliened the lands of the husband and wife, and took back an estate tail, until her election, after the death of her husband, to defeat the entail, she had no estate in fee simple. (Co. Litt. 357 *a*.) So, although a femme covert cannot, strictly speaking, purchase lands, yet if she does, and although the husband agrees to it, still, after his death, she can waive the purchase. (Co. Litt. 3 *a*.)

So, Mrs. Malette, having no estate in the lands aliened by her husband, but a privilege, personal to herself, of defeating the act of her husband, or of agreeing to it during her life; and so, permitting her heirs after her death to agree or not as they choose, cannot be compelled by an execution creditor to make her election. Even if she do not see fit, by her own deed, to secure the alienee of her husband against all contingencies, no one can compel her to occupy an attitude perhaps repulsive to her sense of justice or respect to her husband.

The principle here involved has frequently been recognized by this court. The case of Bower v. Higbee, 9 Mo. 260, was this: Higbee had trespassed on land to which one Eiler was entitled to a pre-emption. Eiler had leased the land to Bower, which was a void act, but the court arrive at the discussion of the principle now involved by assuming the contrary.

"What," says Judge Scott, "is a pre-emption right? Is it any interest in the land? Is it certain that the party entitled to it will ever avail himself of it? Until he does, there is certainly no surety that he will ever acquire any right. * * * A pre-emption is nothing but an offer by the government to an individual settled on the public lands, which he may or may not accept. * * * That he will accept may be presumed, but still an absolute certainty that he will accept, when the time for acceptance comes, will not confer any right until an

acceptance is actually signified in the manner prescribed by law."

Now, what is a right of voidance? Is it any interest in the land? Is it certain that the party entitled to it will ever avail herself of it? No right to avoid—no presumption that she will avoid—will confer any estate or interest in the land until an avoidance be actually exercised.

On this head, further reference may be had to 2 Preston on Abstracts, 204; 3 do. 25; Wivel's case, Hob. 45; 3 Durn. & East. 355; Bartlett v. Glascock, 4 Mo. 62; Hatfield v. Wallace, 7 Mo. 112 & 10 Mo. 398; Brant v. Robertson, 16 Mo. 129. In the latter case, Judge Gamble states (16 Mo. 149) the proposition:

" When parties have bound themselves by agreement to convey land and to pay for it, equity recognizes an interest in the land as already in the purchaser, and the case is the stronger when the purchaser has actually paid in whole or in part; and in either case the interest of the purchaser may be sold on execution, on the principle that the vendor is to be regarded as seized in equity to the use of the purchaser. But if no money has been paid, and if the person who may have become the purchaser is not actually under any obligation to pay, then there is no seisin in the seller, even in equity, to the purchaser's use, and there is no interest in the land which is liable to sale on execution."

In the recent case of Vancourt v. Moore, 26 Mo. 96, this court went much further than it is, for the purpose of this case upon any view of it, necessary to go. " The fourth section of the act concerning conveyances," says Judge Scott, " empowers any person claiming title to any real estate, notwithstanding there may be an adverse possession thereof, to sell and convey his interest therein in the same manner, and with the like effect, as if he was in the actual possession. It is conceived that this provision does away with that rule of the common law which required a grantor of land to be seized thereof, when he makes his deed of conveyance, in order that his covenant of warranty may attach to, and run with, the

land. This section was introduced to enable persons having claims to land without possession, or even in case of adverse, possession, to alien such lands as though they were seized thereof. But, whilst the law thus enables individuals to dispose of their claims to real estate, and thus to affect themselves by their conveyances, there is nothing which authorizes the courts, or the officers of the law, to sell or convey such claims. If there is no title, nor any interest, nor any possession in a judgment debtor, in cases without the influence of the registry laws, there is no power in the officer to sell a mere claim under an execution. There being nothing on which the sale can operate, it is ineffectual for any purpose, and it is as though it had not been made."

*S. T. Glover* with *Munford*, for respondent.

I. The title of the plaintiff was perfect to two-thirds of the land sued for. See Boyle v. Meegan, 19 How. 130, where all the facts, and all the law, are discussed and settled ; and 22 Mo. 36, Reaume v. Chambers.

II. When one tenant ousts another, an ejectment lies in favor of him who is ousted of his part. This is admitted on the other side. But it is denied that, in such case, any damages can be recovered. But if an action lies, why cannot damages be recovered ? If you can recover the land, you can recover the damages. (R. C., p. 692, § 12.)

BATES, Judge, delivered the opinion of the court.

This suit is an action, in the nature of ejectment, to recover two-fifths of a forty arpen lot, in the common field of St. Louis, confirmed to the representatives of Francis Moreau, by the act of 29th April, 1816. Both parties claim under Moreau. The plaintiff derives title by sheriff's sale, on execution, under a judgment against Angelique Mallette, Pierre Wilhelmine and Melaine Cené his wife, and Felix Pingal and Josephine Cené his wife. Angelique Mallette was a daughter of Francis Moreau, and the wives of Wilhelmine

and Pingal were daughters of Helen Cené, deceased, who was also a daughter of Francis Moreau, deceased. The defendants relied upon a supposed deed from Antoine Mallette and said Angelique his wife, and Pierre Cené and said Helen his wife, and other descendants of Francis Moreau, to Pierre Chouteau, which deed, and the circumstances attending its execution, will be found at large in the case of Reaume v. Chambers, 22 Mo. Rep., p. 39 and following. Before offering that deed in evidence, the defendants, to prove the execution of it, gave in evidence the deposition of Angelique Mallette, as follows :

Deposition of Angelique Mallett, a witness of lawful age, produced, sworn and examined, at the residence of Pascal Mallett, in the county of St. Clair, and State of Illinois, before me, Theodore Engelmann, a notary public within and for the county of St. Clair, and State of Illinois, in a certain cause now pending, in the St. Louis Land Court, in the State of Missouri, between Jeremiah T. Boyle, plaintiff, and John Sexton, defendant, on the part of said defendant.

The witness being French, not understanding the English language, Francis Lemay was sworn to interpret the questions put to her into the French language and her answers thereto into English ; and the deposition was taken through him as interpreter. The witness deposes and says, to

*Interrogatory* 1. State your age, name, and place of residence. *Answer* 1. My name is Angelique Mallette ; I am about sixty-seven years old; reside with Pascal Mallet, in St. Clair county, Illinois.

2. How often have you been married ? Name your husbands. *Ans.* I was married but one time, to Antoine Mallette.

3. Whose child are you ? Give the name of your parents. *Ans.* I am the child of Francis Moreau.

4. Name your sisters. *Ans.* Lisette Moreau, Mary Moreau. Lisette was married to Menard ; Mary was married to a man by the name of Caieu ; Ellen and myself are twins ; Ellen was married to a man by the name of Pierre Sné (Cneay).

5. Had Francis Moreau, your father, any tract of land in St. Louis county? If so, state where it was. *Ans.* I never knew it from him; we were too young when he died.

6. Was any tract sold by his heirs to any body? If so, to whom? *Ans.* No, sir.

7. Did Pierre Chouteau ever? (Withdrawn.) Since your father's death, did you ever sell your right to any tract of land as his heir? (Objected to as leading.)

8. Have you ever heard of any tract of land in St. Louis county, belonging to the heirs of Francis Moreau? (Objected to by counsel for plaintiff as leading and incompetent.) *Ans.* I heard something about it; it was so recorded; one of the sisters stated to me we had some land over there, but did not know where it was.

9. What sister stated so to you, and when? *Ans.* I cannot say, it is so long ago; it is about eighteen years since she died, and it was some time before that.

10. Did you or your sister do anything about that land? *Ans.* No.

11. Did Peter Sné own any lot in St. Ferdinand? *Ans.* Yes.

12. From whom did he get it? *Ans.* I understood he had it from Mr. Cadet.

13. Whom do you mean by Mr. Cadet? *Ans.* Never heard any other name but Mr. Cadet.

14. What was the name of the family of Mr. Cadet of whom you speak? *Ans.* I do not know; Mrs. Berthal is a daughter of Mrs. Cadet; she is an old woman.

15. Do you know why Mr. Cadet sold this lot in St. Ferdinand to Mr. Sné? *Ans.* He exchanged it for a piece of land.

16. State all you know about that exchange. *Ans.* I know nothing of it.

17. State what piece of ground it was that he exchanged for it. *Ans.* I do not know; I do not know where it is.

18. Did Peter Sné ever speak to you about it? *Ans.* He spoke to my husband about it.

19. What was said, and what was done about it? *Ans.* Mr. Sné came there with another man, I understood, to make an exchange of land.

20. What had you and your husband to do with it? Go on and tell all that occurred. *Ans.* Mr. Sné came there with another man and made me sign a paper, and I do not know what they have done afterwards.

21. What was that paper about? *Ans.* I signed it for Mr. Sné, to make an exchange of a house and lot.

22. Where was that house and lot? *Ans.* I cannot tell the place at present; I think it may have been at Florissant.

23. What was the piece of land she and her husband exchanged for the house and lot of land at Florissant? *Ans.* I do not know.

24. What were your rights to the piece of land which you exchanged? *Ans.* If I had anything it had come to me.

25. How had they come to you, and from whom? *Ans.* I do not understand.

26. Had you inherited or acquired the right you sold? *Ans.* The land came from my father.

27. Where did you understand that land to lie? *Ans.* I do not know where that land was.

28. Have you ever heard where it lay? *Ans.* I have not.

29. Did your husband sign it at that time? *Ans.* Yes.

30. Did any other person sign that paper? *Ans.* I heard that others signed it; but I do not know.

31. Who else did you hear signed it? (Objected to by plaintiff's counsel as leading and incompetent.) *Ans.* I understood that my brother, and my sister, and my niece, signed it; but do not know it.

32. Give the names of those you heard of having signed it. (Objected to by plaintiff's counsel as leading and incompetent.) *Ans.* Joseph Moreau, Mary Moreau, and Leonore Menard, my niece.

33. What did you say just now about Madam Ortice and Madam Colin? *Ans.* I understood that they also signed it, but do not know.

34.. From whom did you hear that Mary Moreau signed it? *Ans.* By Mr. Sné.

35. From whom did you hear that Leonore Menard signed it? *Ans.* By Mr. Sné, and no other person.

36. From whom did you hear that Madam Colin signed it? *Ans.* By Mr. Sné, and no person else.

37. From whom did you hear that Madam Ortice signed it? *Ans.* Mr. Sné told me they had signed it; nobody else.

38. Did any of these claim the land after the exchange? *Ans.* No, sir.

39. How long ago was this exchange? *Ans.* I do not know; cannot recollect, it is so long ago; I think about thirty years—may be more; Emilie, the wife of the interpreter, was not born.

40. Did you know John Mullanphy? *Ans.* Yes, the old man, the father of Mr. Chambers, I knew.

41. Did you know him very well, or see him often? *Ans.* I knew him and saw him often.

42. Did you ever speak to him about this land? *Ans.* I did not know he had it; never heard him speak about it; I have heard of it since.

43. Did you or your husband ever claim it after the exchange? *Ans.* No.

44. Were you on good terms with Mr. Mullanphy? *Ans.* I had nothing against him, and think the other party had nothing against me.

45. Did you get goods from his store, and were they always paid for; and if so, how? (Objected to as leading and incompetent.) *Ans.* He was giving not only to myself but to all the poor.

46. How long did this continue, in regard to yourself? *Ans.* He might have given me a hundred dollars' worth at different times during the year; perhaps more than a year, as far as I can recollect.

47. When was this? *Ans.* When I got married he gave me some money; and when he went to France he left me a dollar's worth to get every week at the store, as he did to

other poor orphan children; this was about thirty years ago.

48. Do you know how to read or write? *Ans.* No.

49. Have you made any other deed except the said deed of exchange? *Ans.* No other; only with Mr. Sné.

50. Do you know Fremont and Reber? *Ans.* Yes.

51. Did you ever make them any act? If so, what? *Ans.* Yes; I made a deed to Mr. Fremont and Reber.

52. What was that deed for? *Ans.* I do not know.

53. How came you to make that deed to Fremont and Reber? *Ans.* They told me I had a piece of land, and I gave it to them to plead in half, and afterwards I sold it to them.

54. Did you sell all your interest in the same to them? *Ans.* Yes.

55. Were you to receive nothing in case they gained the suit? *Ans.* Mr. Fremont told me if he gained the land, he would give me a good recompense.

56. Did you ever sign more than one *act* to Fremont and Reber? *Ans.* No, sir.

57. Did Fremont and Reber tell you who claimed the land? *Ans.* No.

58. Was the land sold to Fremont and Reber the same as in the exchange? *Ans.* I believe, yes.

59. Did you know this at the time you made the *act* to Fremont and Raber? *Ans.* No.

60. Did you ask any questions about this, when you made the *act* to Fremont and Reber? *Ans.* I do not recollect. Did you ask whether it was the land sold to Mr. Cadet? (Objected to as leading by plaintiff. Withdrawn.)

61. Did you ask Fremont and Reber any question about what land it was? If so, state all that passed. *Ans.* They said it was land that never was sold. I do not recollect anything.

62. Did you understand that it (the land) was *la grange de terre?* (Objected to by plaintiff's counsel as leading.) *Ans.* I do not recollect. *Ques.* Was suit to be brought for the land by Fremont and Reber? (Objected to by plaintiff's counsel as leading. Withdrawn.)

5—VOL. XXXII.

63. What was Fremont and Reber to do with said land? *Ans.* They did not tell me; I do not know what they were,to do with it; if they had gained it, I suppose it would have been theirs.

64. Who were to sue for it? *Ans.* I have heard nobody say who was to sue. *Ques.* Was not suit to be brought? (Objected to by plaintiff's counsel as leading. Withdrawn.)

65. In whose possession was the land which you sold to Fremont and Reber? *Ans.* I do not know; they had not told me who was in possession.

66. Were you in possession or not? (Objected to as leading.) *Ans.* No.

67. What do you mean when you say that it would be Fremont and Reber's when it was gained? *Ans.* It would belong to them; they bought it and it would be theirs.

68. What do you mean by "its being gained"? *Ans.* I do not understand.

69. How was it to be gained? *Ans.* By going to law.

70. Who was to bring that suit, and at whose expense? *Ans.* I think it was at their expense; I had sold it to them, and they were to plead it for half and to pay all expenses.

71. Were you ever asked to pay the costs of the suit brought for that land? *Ans.* No.

Cross-examination by plaintiff's counsel.

*Cross-interrogatory* 1. The paper which you say you and your husband signed, was it not to Mr. Sné? *Ans.* Yes.

2. Did you ever sign any paper to Mr. Chouteau? *Ans.* No; never saw Mr. Chouteau; did not know him at that time.

3. Did you ever sign any paper to Mr. Cadet? *Ans.* No.

4. Did you ever sell any land, or make any act, either to Mr. Cadet or to Mr. Chouteau? *Ans.* I have never sold nor made any contract to Mr. Cadet or Mr. Chouteau.

Re-examined by defendant's counsel.

*Interrogatory* 1. Did you or your husband not receive ten dollars for some land sold to Mr. Chouteau or Cadet? (Objected to by plaintiff's counsel as leading.) *Ans.* Not Mr.

Chouteau or Mr. Cadet, but Mr. Sné, has paid five or ten dollars to my husband.

2. Was this sum you received for the exchange of land, or for a different transaction? (Objected to by plaintiff's counsel as leading and incompetent.) *Ans.* It was, and I do not know how Mr. Sné arranged it afterwards; I made a deed to Mr. Sné, and I do not know how he arranged it afterwards; at that time the land was not worth much; I did what my husband said, and do not know how he fixed it with Mr. Sné; Mr. Sné got a house and lot in St. Ferdinand from Mr. Chouteau.

3. Was Mr. Sné to give you a house and lot in St. Ferdinand? (Objected to as leading.) *Ans.* No.

4. To whom was the house and lot in St. Ferdinand to belong for which the exchange was made? *Ans.* To Mr. Sné.

5. To whom did you understand the land was to belong for which you signed the paper for Mr. Sné? *Ans.* I signed for Mr. Sné, and I think it ought to belong to him.

6. Between what two persons was this exchange made? *Ans.* Between Mr. Sné; Mr. Sné was there with another man; I do not know who he was.

7. With whom did Sné exchange this land? *Ans.* I know he got a house from Mr. Cadet, but do not know how he arranged it with him.

8. Was not this house and lot from Cadet given in exchange for the land you sold? (Objected to by plaintiff's counsel as leading.) *Ans.* I do not know how they fixed it between them.

9. Was this the same paper signed by your sisters and brothers, spoken of by you before. (Objected to by plaintiff's counsel as leading.) *Ans.* Mr. Sné told me they had to sign it, but I never saw it.

10. Have you not said, that Mr. Sné got this house and lot as pay from Mr. Cadet for procuring your signature to the sale of your father's land. (Objected to by plaintiff's counsel as leading and incompetent.) *Ans.* No.

11. Did you ever sign any other deed for said land, except

the paper to Sné, before that to Reber and Fremont? No; except one to Mr. Clemens.

ANGELIQUE MALLETTE, + *her mark.*

The deed having been offered in evidence, it was, on objection made by the plaintiff, excluded as to Angelique Mallette, Helen Cené, and Marie Colin, and admitted as to the others. The defendants also gave in evidence a deed from Pierre Chouteau to John Mullanphy, under whom the defendants claim. The defendants moved the court to instruct the jury that said deed, if executed by Antoine Mallette, operated to pass his wife's interest in the land to Chouteau, subject to be avoided by the wife, which the court refused to do.

Mr. Field, the counsel for appellants, now makes these points: 1. That the deed of 1818, being more than thirty years old, and having been produced from the proper custody, was admissible in evidence without further proof.

2. That the execution of the deed by Mrs. Mallette is proved by her deposition.

3. That, by the Spanish law, the right was vested in the husband, upon his marriage, to convey the paraphernal property of the wife, with her consent, and that this right was not taken away by the introduction of the common law.

4. That, by the rules of the common law, the deed of the husband is effectual to convey the fee in the lands of the wife, subject to be avoided only by the wife or her heirs; and in the present case no such avoidance is shown.

I. As to the second point. The deposition of Mrs. Mallette does not prove her execution of the deed to Chouteau? If it prove the execution of any deed, it is of one to Pierre Cené, and not to Chouteau. No circumstances are shown to support the supposition that the deed was to Chouteau, and that, in exchange therefor, Chouteau conveyed a house and lot to Cené. If that had been the fact, doubtless it could have been shown by other testimony. The deed, therefore, remains unproved.

II. As to the first point. It was not admissible in evidence

as an ancient deed. The Supreme Court of the United States has so held, in the case of Meegan v. Boyle, 19 How., on page 149. That case covers all the ground of this case, and is certainly entitled to the very highest respect, whether it be regarded as governing this case authoritatively or not. As the decision in that case was upon matters occurring in the Territory of Missouri before the establishment of the State, it may well be considered as of actual authority.

Judge Scott, too, in the case of Reaume v. Chambers, 22 Mo. Rep., at page 53, held that the principle upon which ancient deeds are held to prove themselves has no application to this case.

III. As to the third point. It is conceded that this property in the wives of Malette and Cené, was paraphernal property. Whether the husband may administer such property with the consent of the wife or by her appointment, it is not material to inquire, as it is not claimed that he can do so without her consent or appointment, and there is no evidence of either in this case.

IV. As to the fourth point. Mr. Field has shown great research into the ancient common law, in order to show what estate the husband has in the lands of the wife; what is the effect on the estate of the wife of the alienation by the husband of her lands, and in what manner the defeasible estate of the husband's alienee can be avoided.

Without consenting to the conclusion to which he has arrived, it is sufficient to say that it was never understood in Missouri that the husband could alien the estate of his wife in lands without her consent. All acts of the legislature of the Territory and of the State, and all decisions of the courts, which touch or affect the subject, deny, in some form, his right to do so. It is not the common law of Missouri.

So, considering the third and fourth points upon which the appellants rely for a reversal of the judgment, it is not necessary to give any opinion upon the vexed question whether the introduction of the common law, by the act of 1816, repealed the Spanish law, or in what manner it affected it.

For the purpose of this case, such an opinion is not required, and it is not supposed that the question is of any general importance.

A question was made as to the right of the plaintiffs as tenants in common with the defendants to recover damages against their co-tenants.

That question was not argued by the counsel of the appellants, because it was expected that it would be fully argued in some other case, in which the appellants are much more largely interested than in this case in which the amount of damages is but small. No opinion is, therefore, given on that question.

Judgment affirmed, the other Judges concurring.